UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
DAVID WILLIAMS,                              :
                                                         :      CONTROVERSION OF
                     Plaintiff,    :      DEFENDANT'S RULE 56.1
                                                            :      STATEMENT
   -against-                                   :
                                                           :      Case:  14-CV-5959 (JFB)(AKT)
COUNTY OF NASSAU, INCORPORATED:
VILLAGE OF HEMPSTEAD, *et al*.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

# PLAINTIFF'S STATEMENT CONTROVERTING HEMPSTEAD DEFENDANTS' <u>RULE 56.1 STATEMENT</u>

1. This statement is not in dispute.

2. This statement is in dispute. *See, e.g.,* Exhibit E at 86-87 (confirming David Williams was "not the guy" and was "trying to alleviate the situation"); Exhibit F ("I told the police officer that ... David Williams[] was not the culprit"). *See also* Exhibit A, at 47 (describing Dwyer's exculpation).

3. This statement is in dispute. What Williams admitted to was that in his attempt to stop James Dwyer from starting a fight with Thomas White, James Dwyer punched Williams in the face, that a tussle ensued, and that Dwyer, approximately a hundred pounds heavier than Williams, then threw Williams down causing Williams's knee to bust open. *See* Exhibit A, at 33-35.

4. This statement is in dispute. Nothing in the record states Williams was peddling loose cigarettes "with" Thomas White or a female named Tasha. Indeed, Williams testified that he thought White and Tasha were "there already" by the time he arrived at the Hempstead bus terminal. Exhibit A, at 26.

5.      This statement is in dispute for the same reason identified in paragraph 4, above. It is also in dispute insofar as Dwyer's behavior is characterized as begging. The record reflects that Dwyer had "demanded" cigarettes," and that he was "[h]arassing people" for them." Exhibit A, at 29.

6.      This statement is in dispute. Plaintiff did not testify to being "upset." What he said was that he told Dwyer that "cigarettes cost money." Exhibit A, at 31.

7.      This statement is in dispute. The source referenced by the defense for this proposition simply provided that Williams's friend White "walked up to [Dwyer] and said something." Exhibit A, at 29.

8.      This statement is in dispute insofar as it describes that Williams simply followed White and Dwyer after they walked away. Instead, Williams's testimony was that he first "waited a while," and "then he walked" to catch "up to Mr. Dwyer" to tell him "it's not worth fighting for a cigarette." Exhibit A, at 32-33.

9.      This statement is in dispute. *See, e.g., See* Exhibit A, at 33-35 (describing Dwyer punched Williams in the face, that Williams swung back and "think[s] [he] hit him in the arm"); Exhibit E at 86-87 (confirming David Williams was "not the guy" and was "trying to alleviate the situation"); Exhibit F ("I told the police officer that ... David Williams[] was not the culprit").

10.     This statement is not in dispute insofar as Dwyer and Plaintiff "tussled" and "Dwyer threw the Plaintiff to the ground." But it was not "in response" to what the defense described happened in the preceding paragraph, because that description was incorrect. *See* response to paragraph 9, above.

11.     This statement is in dispute insofar as it describes a hit and then a tussle, and insofar as it describes both Williams and Dwyer falling to the ground as a result. First, Dwyer

punched Williams in the face, which resulted in a tussle. *See* Exhibit A, at 33-35. Then Dwyer threw Williams to the ground—rather than them both falling to the ground. *Id*. at 35. *See also* Exhibit B, at 15 (Dwyer stating "I threw him to the ground").

12. This statement is in dispute. By the time White and others got involved, Dwyer had already thrown Williams to the ground with his shirt over his head, and the subsequent attack on Dwyer occurred eight or nine feet away. Exhibit A, at 37.

13. This statement is not in dispute.

14. This statement is in dispute, as there is nothing in the evidence indicating Williams "fled." The testimony is, "He walked off and me and my friend walked off" (Exhibit A, at 39), and after purchasing a bottle of liquor they started "walking down Main Street" (Exhibit A, at 40). *See also* Exhibit C, at 39-40 (O'Brien claiming that he first saw Williams and White "walking on the sidewalk right across the street").

15. This statement is in dispute for the same reasons identified in the preceding paragraph, although it is not in dispute insofar as Williams sought to "get the 40 to go to Roosevelt." Exhibit A, at 42.

16. This statement is in dispute. This unidentified Asian witness appears nowhere in any of Nassau County's arrest paperwork in this case—not by name, description, or even reference. Nassau's arrest report, for example, includes room for describing "How" Williams was identified, and Nassau left this slot blank. *See* Exhibit D, at 000002. Nassau similarly made no mention of this purported witness in its "Arrest Narrative" (*id*. at 000004). O'Brien failed to mention the witness to his own supervising detective, Lashinsky, who confirmed he did not recall "anyone ever tell[ing] [him] about a witness in this case." Exhibit I, at 32. And the criminal accusatory instruments lodged against David Williams were similarly mum—describing

the evidentiary basis for the charges without mentioning any third-party witnesses whatsoever. *Id.* at 000006-7.

17. This statement is not in dispute.

18. This statement is in dispute as the very existence of this eyewitness is in dispute. *See* paragraph 16, above.

19. This statement is in dispute insofar as it describes hesitance. *See* Exhibit A, at 42 ("Thomas said the cops are right there. We kept walking").

20. This statement is in dispute insofar as there is any allegation implied within it that Williams knew about a knife at that point or ever saw one in connection with this case at all. *See* Exhibit A, at 45 ("I didn't see a knife. The only time that I heard there was a knife was Mr. Morris put me in a car and Mr. Holly put White in one car. That's when I heard over the radio, we found a knife. I said a knife. Never seen it, never").

21. This statement is in dispute insofar as the defense claims they drew their guns. *See* Exhibit A, at 42-43 ("Q  Did they have their guns out?  A  No.").

22. This statement is in dispute, as the pages referenced by the defense for this proposition do not contain any allegations supporting it whatsoever. Notwithstanding this objection, it is not disputed that O'Brien informed Williams and White that "you guys fit the description of somebody who possibly did something around the corner, and I'm looking into it just like you guys are. And when we figure it out, I'll let you know." Exhibit C, at 50.

23. This statement is in dispute insofar as there is any allegation implied within it that Williams knew about a knife at that point or ever saw one in connection with this case at all. *See* Exhibit A, at 45 ("I didn't see a knife. The only time that I heard there was a knife was Mr. Morris put me in a car and Mr. Holly put White in one car. That's when I heard over the radio,

we found a knife. I said a knife. Never seen it, never"). It is also in dispute insofar as it contains an implicit allegation that Williams held a towel containing Dwyer's blood. The blood was Williams's own—from an injury he suffered after Dwyer punched him in the face and threw him to the ground. Exhibit A, at 44, 58-59 ("I told the grand jury they can take that rag, that's my blood from my leg, take it to the DNA place and examine it").

      24.       This statement is not in dispute.

      25.       This statement is not in dispute.

      26.       This statement is in dispute insofar as it describes a "rag" rather than a "towel." *See* Exhibit E, at 71 ("I took the towel"). It is also in dispute insofar as what the "purpose" of the custody was. Defendant Morris testified that he had already taken custody of Williams by the time he received a radio call to conduct the show-up. Exhibit E, at 71 ("Then we received a call....").

      27.       This statement is in dispute, as the cited source does not claim "Plaintiff was handcuffed for his safety," but rather, he stated the Plaintiff was handcuffed for the police's own safety (and the public's). Exhibit E, at 66. This statement is also in dispute insofar as it contains an implicit allegation that there actually was any safety threatened. *See, e.g.,* Exhibit E at 86-87 (confirming David Williams was "not the guy" and was "trying to alleviate the situation"); Exhibit F ("I told the police officer that ... David Williams[] was not the culprit"). *See also* Exhibit A, at 47 (describing Dwyer's exculpation).

      28.       This statement is not in dispute.

      29.       This statement is in dispute, as Morris repeatedly indicated he knew that Dwyer was specifically exculpating David Williams. Exhibit E, at 84-87 (Q So what happened at the show-up? A We got to the show-up, I took David out of the car first, and ... the ambulance doors

were opened, the victim was sitting up on the stretcher being attended to, given medical attention by the EM or AMT on [a] side of his body [*indicating*].... And I took David at the car to do the show-up, and the victim said it was not David.... Q So James Dwyer looks at David and says that's not the guy? A Yes. Q Did he say he was trying to alleviate the situation? A Yes); at 105-06 (stating that at the grand jury, "[t]hey asked me what did the victim say in regards—toward David, and he said it wasn't him").

30. This statement is ambiguous, but to the extent Plaintiff understands it, it is in dispute. *See, e.g.,* Exhibit F ("I told the police officer that the man he showed me, ... David Williams, was not the culprit").

31. This statement is ambiguous, but to the extent Plaintiff understands it, it is not in dispute.

32. This statement is in dispute to the extent he "took" the statement rather than writing it himself and having Dwyer simply sign it. *See* Exhibit G, at 54 ("Those are the words that I wrote to approximate what the victim told me"), at 43 ("If they agree with what is said, I have them sign the statement").

33. This statement is not in dispute insofar as it generally describes what is contained in statements that Defendant Torres wrote and had James Dwyer sign. Of course, the contents of those statements are in dispute. *See, e.g.,* Exhibit E at 86-87 (confirming David Williams was "not the guy" and was "trying to alleviate the situation"); Exhibit F ("I told the police officer that ... David Williams[] was not the culprit"). *See also* Exhibit A, at 47 (describing Dwyer's exculpation); Exhibit E, at 160-61 ("In my professional opinion, I think maybe if the statement was taken correctly, we wouldn't be sitting here right now.").

6

34. This statement is in dispute insofar as it implies Hempstead does not "handle" cases like this one. That is belied by the fact that Hempstead took custody of White and Williams from Nassau County Police Officers and, on its own, conducted an investigative show-up and then brought Williams down to the Hempstead police station. *See* Exhibit E at 65-68 (arriving on scene to address "a disturbance involving a knife"), 71-72, 82 (describing a call for a show-up), 153 (describing that Williams was at Hempstead headquarters for "A[n] hour, two hours. Maybe even less than that").

35. This statement is in dispute, as the Plaintiff's actual testimony was that "Probably" he was there "about" thirty to forty minutes. Exhibit A, at 50. Officer Morris had a different estimation of "A[n] hour, two hours. Maybe even less than that." Exhibit E, at 153.

36. This statement is in dispute insofar as its reference to Williams simply "awaiting members of the Nassau County Police to interview him" is not supported in the defendant's citation.

37. This statement is ambiguous. To the extent Plaintiff understands it, it is not in dispute.

38. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...."

39. This statement is in dispute, as Officer Morris estimated "A[n] hour, two hours. Maybe even less than that." Exhibit E, at 153.

40. This statement is not in dispute.

41. This statement is ambiguous. To the extent Plaintiff understands it, it is not in dispute except to provide that he was arraigned in court "the next day." Exhibit A, at 88.

7

42. This statement is in dispute to the extent it derives a legal conclusion about rights-waivers. Legal conclusions are inappropriate on a Rule 56.1 statement. *See, e.g., Congregation Rabbinical College of Tratikov, Inc. v. Village of Pomona*, 2015 WL 5729783 (S.D.N.Y. 2015) ("the Court can ... disregard legal conclusions ... in a Local Rule 56.1 statement").

43. This statement is in dispute. Exhibit I (Lashinsky failing to recollect anything about a statement, including whether he asked any questions or whether Williams told him about what happened).

44. This statement is in dispute. The Plaintiff did not implicate himself, and his detention and charges were "based on" Hempstead's failure to report the exculpatory show-up. Exhibit A, at 53-54 (Williams stating that he had explained he had been exculpated and "told the detectives what happened"); Exhibit E, at 130 ("If the witness says this person didn't do it, how do you lock the person up?"); Exhibit G, at 50 (an exculpation at the show-up would have made a "big difference" as to whether Williams was arrested); Exhibit J, at 37-38 (confirming it would be improper to leave an exculpatory show-up out of police paperwork).

45. This statement is in dispute insofar as the cited source is unsigned by Officer O'Brien.

46. This statement is not in dispute.

47. This statement is in dispute insofar as the cited source does not support the claim that Nassau County Police Officer O'Brien completed it.

48. This statement is not in dispute insofar as the arrest report indicates that O'Brien arrested the Plaintiff.

49. This statement is not in dispute insofar as it accurately reflects a sentence contained in O'Brien's testimony. But the content of this sentence is in dispute insofar as it

suggests Nassau County arrested Williams or was the only entity to arrest Williams. Exhibit C, at 50 (O'Brien "basically told them, you guys fit the description of somebody who possibly did something around the corner, and I'm looking into it just like you guys are. And when we figure it out, I'll let you know"); Exhibit E, at 66 ("I never said they arrested them. They stopped them"); Exhibit G, at 50 (an exculpation at the show-up would have made a "big difference" as to whether Williams was arrested).

50. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...."

51. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...." This statement is also improper because it derives a legal conclusion. *See, e.g., Congregation Rabbinical College of Tratikov, Inc. v. Village of Pomona*, 2015 WL 5729783 (S.D.N.Y. 2015) ("the Court can ... disregard legal conclusions ... in a Local Rule 56.1 statement").

52. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...."

53. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...." This statement is also improper because it derives a legal conclusion. *See, e.g., Congregation Rabbinical College of Tratikov, Inc. v. Village of Pomona*, 2015 WL 5729783

(S.D.N.Y. 2015) ("the Court can ... disregard legal conclusions ... in a Local Rule 56.1 statement").

54. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...." This statement is also improper because it derives a legal conclusion. *See, e.g., Congregation Rabbinical College of Tratikov, Inc. v. Village of Pomona*, 2015 WL 5729783 (S.D.N.Y. 2015) ("the Court can ... disregard legal conclusions ... in a Local Rule 56.1 statement").

55. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...."

56. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...."

57. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...."

58. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...."

59. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...." This statement is also improper because it derives a legal conclusion. *See, e.g.,*

10

*Congregation Rabbinical College of Tratikov, Inc. v. Village of Pomona*, 2015 WL 5729783 (S.D.N.Y. 2015) ("the Court can ... disregard legal conclusions ... in a Local Rule 56.1 statement").

60. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...."

61. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...." This statement is also improper because it derives a legal conclusion. *See, e.g., Congregation Rabbinical College of Tratikov, Inc. v. Village of Pomona*, 2015 WL 5729783 (S.D.N.Y. 2015) ("the Court can ... disregard legal conclusions ... in a Local Rule 56.1 statement").

62. This statement is improper under Local Civil Rule 56.1(d), which requires "Each statement by the movant ... [to] be followed by citation to evidence which would be admissible...." This statement is also improper because it derives a legal conclusion. *See, e.g., Congregation Rabbinical College of Tratikov, Inc. v. Village of Pomona*, 2015 WL 5729783 (S.D.N.Y. 2015) ("the Court can ... disregard legal conclusions ... in a Local Rule 56.1 statement").

**STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH A GENUINE ISSUE EXISTS TO BE TRIED.**

1. Nassau County Police Officer O'Brien testified that he and fellow Officer Throo were nearby the scene "shooting the breeze" when an "unknown male, I believe [of] Asian descent" approached them and said "Hey, guys, I want to let you know there's a stabbing that just happened around the corner." Exhibit C, at 38.

2. This unidentified male then, according to O'Brien, proceeded to describe two black men wearing the same clothes as David Williams and Thomas White. *Id*. at 39. And incidentally, just then, Officer O'Brien was "looking right over this guy's shoulder," when "walking on the sidewalk right across the street ... [were] these two guys." *Id*. at 39-40.

3. This unidentified Asian witness appears nowhere in any of Nassau County's arrest paperwork in this case—not by name, description, or even reference; Nassau's arrest report, for example, includes room for describing "How" Williams was identified, and Nassau left this slot blank. *See* Exhibit D, at 000002. Nassau similarly made no mention of this purported witness in its "Arrest Narrative" (*id*. at 000004), and the criminal accusatory instruments lodged against David Williams were similarly mum—describing the evidentiary basis for the charges without mentioning any third-party witnesses whatsoever. *Id*. at 000006-7.

4. Yet by Officer O'Brien's own admission, absent this purported Asian witness, Nassau County never even would have sought to apprehend David Williams. *Id*. at 49 (confirming, "Yeah, that's very fair to assume").

5. When O'Brien and Throo apprehended White and Williams, the arrest was still in its infancy: rather than formally charging them with a crime or giving them any Miranda warnings, Officer O'Brien "basically told them, you guys fit the description of somebody who possibly did something around the corner, and I'm looking into it just like you guys are. And when we figure it out, I'll let you know." *Id*. at 50.

6. Minutes later, Hempstead police arrived. *See* Exhibit A, at 43. Hempstead Officer Holly grabbed White, Defendant Officer Morris grabbed Williams (*id*.), Nassau's "handcuffs were taken off" and Hempstead "placed [on their] own." *See* Exhibit E, at 151.

12

7. Both White and Williams were then escorted down to the south side of a nearby courthouse, where Dwyer was waiting in the back of an ambulance. *Id*. at 47.

8. At or around that ambulance, Hempstead police officers conducted a show-up in which James Dwyer exculpated David Williams. Exhibit A, at 47; Exhibit E, at 84-87 (adding, later on, that "All I could do is testify to the fact that when I brought David Williams to the back of the ambulance for a show-up, the victim stated that David had nothing to do with it. That's it"); Exhibit F, at ¶¶8-9.

9. After Dwyer exculpated Williams, Williams figured he would be released. *See* Exhibit A, at 77 (Describing that after the exculpation, Williams told Morris, "let me go"). But he was wrong. Instead, he observed Officer Morris converse with Lieutenant Montera, after which Williams was kept in handcuffs, taken over to a police cruiser, placed in the back seat, and driven down to the Hempstead police station. *Id*. at 77-79; Exhibit E, at 135.

10. By this point, Hempstead's show-up investigation was over and yet, it was growing clear, Williams was not "free to leave." *See* Exhibit E, at 153-54 ("No, he was not allowed to leave," though he would have wanted to, given that in Morris's words "No one in handcuffs, in my entire life, wants to be there").

11. Back at the station, Williams remained in custody for nearly an hour. *Id.* at 154 ("A[n] hour, two hours. Maybe even less than that"); Exhibit A, at 83 ("Forty minutes" or "within a[n] hour").

12. Meanwhile, one of the officers present for his show-up, Defendant Torres, visited Dwyer over at the hospital. There, he drafted a statement. Exhibit E, at 156; Exhibit G ("I don't know if I finished up the statements from the victim in the back of the ambulance or at the hospital, either one"); Exhibit B, at 23 (Q You mentioned an officer was at the hospital with

13

you? A Uh-hum. .... Q This officer, did he take a statement from you? A Yes."). But not one that made any mention of the show-up's exculpation—an omission Torres later doubled-down on by claiming he never heard Dwyer exculpate Williams. *See* Exhibit G ("I didn't hear him say it").

13. Officer Torres then had Dwyer sign the statement, and the statement was then added to Williams's arrest paperwork. *See* Exhibit G, at 54 ("Those are the words that I wrote to approximate what the victim told me"); Exhibit B ("Q But you recall there was a police officer who visited you at the hospital; is that safe to say? A Uh-hum. He probably did make me say something, but—but I don't know. He might not have"). Left conspicuously absent from that paperwork was any reference to the exculpatory show-up. *See generally* Exhibit H.

14. In turn, Williams's time back at the Hempstead police station did not result in his release; it resulted in his transfer to Nassau County. *See* Exhibit A, at 83. Yet at no time before, during, or after this transfer did anyone from Hempstead inform anyone from Nassau that Williams had already been exculpated. *See, e.g.,* Exhibit E ("Q Was Nassau County made aware of the outcome of the show-up? A Not from me"). *See also* Exhibit C (Nassau Officer O'Brien: "Q ...[A]s you sit here today, do you know what happened at the show-up? A No, I don't"); Exhibit I, at 27 (Nassau Detective Lashinsky: "Q ... [Y]ou have no independent recollection of a show-up happening in this case other than having a conversation with [Nassau County Attorney] Hanley? A Correct").

15. This failure to report the exculpatory show-up led directly to his detention being continued. *See* Exhibit E, at 130; Exhibit G, at 50; Exhibit J, at 37-38. *See also* Exhibit C, at 33 (Nassau County Officer O'Brien stating it would "defeat the mission" for Hempstead to withhold important information from Nassau County"); Exhibit I, at 21 (Nassau County Detective

14

Lashinsky stating "No," he would not expect anyone from Hempstead or any other police department to hold back material investigative information).

16. So that is exactly what happened to Williams's detention: it continued. Williams spent over a week in Nassau County Jail, with Nassau having no information about the show-up until Defendant Morris testified in a grand jury, finally informed it of the exculpatory show-up, and the grand jury returned No True Bill. *See* Exhibit E, at 105-06 (stating that at the grand jury, "[t]hey asked me what did the victim say in regards—toward David, and he said it wasn't him"). *See* Exhibit K (copy of criminal disposition).

17. Overall, David Williams had been in custody from July 15th until July 23rd. *Id.* (describing that on 07/23/2013 the case was dismissed by the grand jury).

Dated: May 26, 2016
      Garden City, New York

      Respectfully submitted,

      BARKET MARION
      EPSTEIN & KEARON, LLP

      _____/s/_____
      Alexander R. Klein, Esq.
      666 Old Country Road, Suite 700
      Garden City, New York 11530
      516.745.1500